Mr. Saunders. Okay, our first case this morning is number 17-2304, ABV, Biotechnology Ltd. v. United States. Mr. Saunders. Good morning, Mayor Peter Cooper. These appeals have these groundbreaking claims. The original dosing regimen, we have the best-selling drug in the world to market. The first monoclonal antibody ever approved by the subcutaneous administration. That's any antibody, any mutation. The claims are on a method, right? They're not on the actual antibody itself. Right, the claims are on the dosing. The dosing, okay. And that was the first subcutaneous administration antibody ever approved by the FDA. And it's obvious the board made a series of legal errors, in which it shifted the burden onto ABV, as well as on scrutiny that showed an intense obviousness. It failed to consider all of the claim elements in combination with long-term treatment for at least 24 weeks. It plucked individual statements from references without giving the full context of what they taught. And it analyzed commercial success in the framework that this board has. One of your main points is that the 0.5 milligram, kilogram dosage in these prior studies wasn't effective, right? And, for example, on page four of your reply brief, I guess you collect the evidence here that deals with that. And you say, Rao disclosed that 58% of patients receiving 0.5 milligram, kilogram, never achieved an ACR 20 response at any point in time. But that strikes me as a bit misleading, because, for example, if you look at Kempenny at appendix 2304, it shows a 70% response to the weekly 0.5 milligram. Kempenny? Yes, Kempenny. And then Rao also teaches a 78% moderate response on 28085. But let's look first at 2704, which is Kempenny. And it says there's a weekly, this is table two at the bottom, and it says weekly 0.05 milligram to kilogram SC, that is subcutaneous injections, is an ACR 20 response of 70%. Oh, yeah, I understand. So that is weekly dosing. So the claims here are every other week dosing. So when you're talking about 0.5 milligram, kilogram weekly dosing, you're talking about essentially a joppa of what we have in the claims here. And so the point is that to reach its obvious determination, the board was combining weekly subcutaneous doses from Dean's P7 study, with the, at least every other week, intravenous weight-based doses from the P3 study, which is mainly reported in Rao. And the glaring problem with that was that for the allegedly equivalent 0.5 milligram to kilogram dose in that D3 study, the persistent up-dose. Indeed, before you add the uncertainty of moving to subcutaneous doses, it's closer to the cross-patient population. You're referring to DE and then some number, and you'll have to forgive me. The way I think about it is, you know, certain excerpts that I've read from certain references. For example, Campeni. I know Campeni is telling me that they were talking about how you can administer D2E7 biweekly, intravenously at 0.5 milligrams per kilogram, which, as I understand it, people seem to agree is roughly 40 milligrams. So 40 milligrams taken every other week. And then I see here an explanation that that seems to have a pretty positive outcome. I understand that it says for those who did not respond, got up-dosed, but it's not so clear to me that that suggests everyone that got 0.5 milligrams per kilogram did not respond well. Right, so Campeni reports up-dosing, and then Erskine, for those who didn't respond well. Right, for those who didn't respond well. And then when you look at the reports on the same study in Rau 2000, and so that's, you know, we agree that page 39 showed the charts. It's undisputed that by week 12, after week 12, every single patient who had been on that dose was up-dosed. Yeah, but that says specifically they were up-dosed because it was a study to determine safety, and they wanted to give them the larger dose to measure safety. Yeah, but the purpose of it was to measure safety. It wasn't to measure efficacy. They weren't abandoning the thing because it wasn't efficacious. They were changing it at 12 weeks because they wanted to measure safety at the higher dose. But for every 0.5 milligram per kilogram dose, there was up-dosing, and it didn't say they were doing it just for dose escalation. It was the patient's arm was up-dosing. Well, what page of the appendix is this at? So Campani, page 2704, talks about the patient's arm is up-dosing. 2704. It's also on 28080, right? Campani is in the appendix twice. Yes. So what it says is to keep as many patients as possible in the study for the long-term evaluation of safety, patients who did not respond, etc., etc. It's focusing on a change in the dosage because they wanted to measure safety. Well, if the DE3 study that we talked about here is something about which you're only going to make determinations of safety. No, no, but I'm talking about the line. To keep as many patients as possible in the study for the long-term evaluation of safety, patients who did not respond well after 0.05 or 1 milligram received higher doses. But the discussion of safety is because these are the Phase I clinical trials for which you're looking at safety, but the board's obvious discrimination depends on relying on the efficacy. No, no, but the point is that they didn't take them off the 0.05 dosage because of lack of efficacy. They did it in order to measure safety, correct? We asked both of the other side's experts about this, and said, for Coherence's expert, this is the appendix 6189. For DE2E7, are there any possible reasons for updosing other than the fact that patients were not responding well? And their answer was that would be speculation. But look, I'm reading the study itself. Forget about the characterizations. It says they updosed them because they wanted to conduct a long-term evaluation of safety, right? They wanted to conduct a long-term evaluation of safety, and they were losing patients, the patients who were not responding well. And so they were updosing those patients to keep them in the study rather than have them continue with the inadequate response. Well, it doesn't say that, but that's another issue. If you look at these tables, I guess they are 4 and 5 in round, these show that the 0.05 dose, in fact, after 12 weeks, was about as effective as the higher doses, right? The undisputed expert test beyond that is these are, that's highly unspecified, but these are averages. And so when you have updosing like this, the other side of that table is asking how. Let's just take the charts for the moment. We'll put aside the experts. These charts show that in terms of the measurement here of efficacy, it's about the same after 12 weeks, right? Or even perhaps a little better in chart 5. I'm not talking about after 12 weeks. I'm talking about at 12. I'm quoting 31387 in the appendix, 31389, the other side's expert in the codes. He says, I can't say for any of those points how many patients are left. And that's a big problem when you're looking at this. We, at 2949, put in the FDA guidance for rheumatoid arthritis drugs for 1999. And it talks about dropouts. And probably it says, quote, since dropouts do not usually occur randomly, the remaining patients come from a biased subsample of the patients who were originally amended. That may be, but the chart is the same thing that's true for all the dosages. And the chart shows that in terms of efficacy at week 12, it's about the same, right? All the other doses are showing averages across the patients. Where you have updosing, you can't compare that because you're taking out, if you take out all the people who aren't succeeding, then the average is going to be... What tells us that in this period up to the 12-week mark that people were taken out of the study who were receiving the 0.05? Where does it say that? That says that the placebo patients are coming in at week 6? That's at page 4593 of the appendix. Placebo patients came in... Wait, wait, 4596? 4593, the appendix. Okay, where does it say that? I have a question. You look straight at the third line from the third injection on. However, the study was open-labeled. Well, I'm sorry, where? The third line, 4593. From the third injection on, however, the study was open-labeled. Patients who had been receiving placebo during the placebo-controlled period were switched to the corresponding dose of D287. What does that have to do with what I was asking about, which is the lower dose? I'm sorry, I'm not understanding where you're getting that from. The sentence you showed me had to do with patients who were receiving placebo. People who had only been on the dose for six weeks. But that's about placebo. That wasn't what my question was. No, no, this is patients who switched from placebo. So the doses are structured. You have patients who eat dose, and then connected with each of those you have a placebo set of patients, and those continue together for week 6. At week 6, the placebo patients get switched on to the corresponding dose. So you have people going on to the 0.5 mg per kg dose for the very first time at week 6. Absolutely, it would be true of the other doses. Well, if the chart doesn't show anything at all, then the chip in the back... No, it doesn't. That's true in the DE-001 study, which stops much earlier, but it's not true for the 12-week point on the chart. This isn't just my description. The RAO itself signals out cravings, doses greater than 1 mg per kg, and it criticizes the doses at 0.5 mg per kg. Yes, but that's for the DE-001 study, not for the 3 study, which takes up to 12 weeks. No, the RAO criticism, the RAO statement of greater than 1 mg per kg that's at 28085 of the appendix is its description of the statistically significant... If you look at 28085, it talks about the 0.5 mg over 12 weeks resulted in a moderate response in 78% of the patients, right? Correct, averaging up to 10 mg per kg. And... So what we have here is... Okay, I don't want to take up all of your time. Why don't you move on to another subject unless Judge Chin has other questions? No. We'll give you a couple more minutes here. You don't need to sit down. You can talk now. Okay. I would say in addition to the... I think what we are talking about here is a fundamental point of uncertainty that was resolved against us to... with the burden of us to resolve that. We saw the same thing on the semen levels. These are the trough concentrations between doses where when you stretch a dose like this, you may be giving the same total amount of doses, but it's understood that you get dips, larger dips between doses. And the board's response to that was to say, well, the minimum effective dose was undefined in June 2001. So we would have disregarded the fact that you're going to a low amount. That is exactly our point. The minimum effective dose was undefined. But what if, as I understand the board, they had Vandeput, we haven't talked about that yet, which showed, albeit weekly administration, subcutaneously, 20 mg, 40 mg, 80 mg, were all statistically superior over placebo, and likewise they were all essentially equivalent in terms of their effectiveness. That's what Vandeput says. Now we go over to Campanian, we see, okay, you can take a 40 mg equivalent, 0.5 mg per kilogram, biweekly, do it intravenously, and what if we just accept for now that substantial evidence supports the idea that Campany also supports that that would be, give you a good enough response. Maybe not as good of a response as 1 mg per kilogram or 3 mg per kilogram, but nevertheless good enough that that would be something that would be considered a positive outcome. So when you look at all of that and then say, well, we already know that taking it biweekly is going to get you a decent result at roughly the same amount as 40 mg, that is to say 5 mg per kilogram, so therefore there's a reasonable basis to go from that 0.5 mg per kilogram to a fixed 40 mg dosage every other week. Right, so I think there are two issues with that. So even setting aside up-dosing, when you're talking about numbers in Bandaput, we're talking about going to semen levels that are below anything we saw in Bandaput, even though the other science experts said you would want a dose at or above the semen level of shown priority. And when you go over to 0.5 mg per kilogram to try to give yourself that assurance, you have to remember that those are intravenous weight-based doses that then are being diverted over. You can say what if we're taking those over to subcutaneous doses. And with the loss of bioavailability that occurs when you, rather than injecting it straight into the bloodstream, you're injecting it under the skin and it has to be absorbed. And then also the claims are bringing together that with fixed doses. Meaning you have to have a dose that is working across the patient population. It gives you less margin of error to say I'm going to go as low as possible when people are being individually dosed in route. Yeah, but it was known in the art to give a fixed dosage. Vandeput's a clear example of that. Well, it may be known in other arts to give a fixed dosage. I think we should remember here, at this time there is one antibody approved as the anti-TMI antibody and it is dosed intravenously weight-based doses. At this time, there are zero antibodies any time, any condition, that are approved for subcutaneous administration. This is very, very, very early in this art here and so it's an abstract principle. Kempeni says subcutaneous administration would be a promising approach and says that they're comparable the subcutaneous and the intravenous administrations. Talking about results achieved with different doses. I think one of the gardens here is claims that are bringing together both the dose that is absolutely on the low end with subcutaneous administration with the fixed dose and with the longer dosing. And so you can look, and this is one of the issues with the board's opinion, is you can look in isolation and say, oh, these would be equivalent, but the context for that is talking about higher doses. But it doesn't have to be equivalent, right? I mean, the claims only require some efficacy. It doesn't require a particular level of efficacy saying, use the most effective one. And your theory, I guess, is that in terms of motivation, it combines that you would use the higher dose to achieve the greater efficacy? Well, you would... It's not necessarily rare, because it's ensuring that you would get efficacy in the context of there being not usual pressures to go to the lower dose. In the sense that BI is expert. Yeah, but these studies show considerable efficacy at the 0.5 level. It may be slightly below at 12 weeks what you get from the higher dosage, but on the face, these things show efficacy at the 0.5 level at 12 weeks. I mean, let's enter in 24-week claims. Rao, many, don't have anything to teach about the 0.5-kilogram dose at 24 weeks, because it's undisputed. Whatever the reason, it's completely discontinued. Wouldn't it be obvious to keep treating someone with rheumatoid arthritis past 12 weeks, though? Well, we have to talk about the reasonable expectation of success, and that's where you look at the statements in Rao about the fact that the erythrocyte sedimentation rate, which is a measure of inflammation, is getting worse again after only one week. And the fact that there was updosing, and the fact that when Rao talks about long-term treatment, it says, yes, we got long-term efficacy with the doses greater than 1 mg per kilogram. There's a complete absence of inflammation reported in the prior, or there in the DEO3 study, as to how people are going to do it. Did you separately argue the 24-week point before the board? Yes, we did. Refer you to the page 44822. Which volume is this? Which volume is this? Okay. Well, unless Judge Chen has further questions at this point, why don't we... Just one more. When it comes to this combination of Vandeput and Kempeni, there's two board decisions that are discussing that combination. One is the Coharis IPR, the other one is the Boehringer IPR. Right? And I don't recall seeing in your blue brief a retort to the Boehringer rationale for combining Kempeni and Vandeput. I think it was just taking the same references and running them in the opposite direction. There seemed to be a routine optimization theory expressed in the Boehringer IPR that wasn't necessarily articulated in the Coharis IPR or board final written decisions. So, that's why I'm wondering that maybe there's something of a delta between the two board decisions and how they combined these two references. But I don't think in either of those board decisions that it in the board is itself accepting a routine optimization theory. And one of the reasons here is we talk about 96 different power rationales just on the basis of in the higher art. And so we don't have a small number of easily traversed things to try here. We have 96 different ways you can go and the board's own reasoning said the way you're going to do this is with clinical studies. 96 different clinical studies. This is not a matter of easy treating for routine optimization. This is unpredictable chemistry. This is chemistry where we try 80 milligrams monthly. Failure. No better than unpredictable dosing first. Okay. Well, I think we're out of time. We'll give you two minutes for a bubble. Mr. Medich? Are there two different rationales for the combination of Van de Poot and Kempeni and the two different IPR board decisions? Your Honor, yes. And may it please the court. I think you can look at the prior in this case in one of two ways. I think you can either say you take the DE you take the DE7 which is the Van de Poot reference with the 20 milligrams and 40 milligrams weekly and you stretch that out to every two weeks. There's a very clear rationale and motive for a person to do that because no one likes being injected more frequently than they have to be so patients would want to be injected less frequently. Alternatively, you could look at the DE3 reference and say, well, When you say DE3 reference, do you mean Kempeni? Kempeni and Rao. Sorry, Your Honor. The Kempeni and Rao report, the early DE3 study, Van de Poot reports the later DE7 study. Or you could look at that dose and modify that and say, well, subcutaneous is more convenient. In the Coharis IPR, the board rejected that first theory you just expressed, right? The idea of taking Van de Poot and stretching it out from a weekly dosage to a biweekly dosage? I don't think that's exactly what the board was up to. The board looked at the two-week half-life and said that that alone would not counsel in favor of a two-week dosing regimen. I think that's what the board was saying. But they later said in the Bollinger IPRs that it was a factor. And in fact, in the Coharis IPRs, I think if you look at what they actually said, they sort of hinted that it was a factor, which I suspect is probably why Bollinger made that argument. I'm confused. I'm just talking about the Coharis IPR final written decision. No, I understood, Your Honor. So in that decision... There's only one theory, and it's based on leading with Kempeni. It leads with Kempeni. You're telling me there's a second theory in there? No, so the argument for motivation to combine them was one of the theories that was offered in the Coharis IPR was that if you look at the half-life of the drug, it was known to be about two weeks. And so a lot of skill in the art would have said, well, a two-week dosing regimen, based on that fact, would have been obvious. The board rejected the idea that half-life alone was sufficient to get you from... Right, but the board didn't adopt any second theory that led with Vandeput in the Coharis IPR final written decision. Am I right? I don't think so. Okay, so then where did it say, yes, you could start with Vandeput and you could legitimately, reasonably expect that you could extend it out from a weekly to biweekly dosage? In the Coharis IPR? Right. That's what we've been talking about. So I'm not sure that the board necessarily had to decide which one you would start with, because the reason was that from the combination of the two, you would have gotten there. And in all events, the board clearly did find that in the Barringer IPRs and found the same claims invalid. So even if the board didn't find that there, they... Well, they didn't find it there. There was only one theory in Coharis. It was leading with Campenni, and then switching over from 0.5 mg to kg to a fixed dosage of 40 mg, and then changing over from intravenous to subcutaneous, and relying on Vandeput for those two things. It never, in the Coharis IPR, made any kind of finding of motivation to extend Vandeput's weekly dosages to a biweekly and then double up in the Coharis IPR. So in the... In the Bowringer IPR, yes, but I've been talking to you for the past three minutes about the Coharis IPR. So in the Coharis IPR, the board said Campenni expressly discloses a dose that is equivalent to the recited subcutaneous 40 mg dose. Campenni also teaches biweekly administration. Accordingly, Campenni explicitly provides motivation for converting Vandeput's weekly dosing regimen from DE7 into a Appendix 70 and 71. Does that answer the question, Your Honor? Go ahead and go on. So I think I'd also like to address what my colleague on the other side said regarding the patients being shifted off the dose. I think that's not... I think that's a little misleading because of the breadth of these claims. Because these claims cover treatment of any patient, the fact that even some patients were still having success with the dose as of week 12 would teach these claims. So in title... What does the record show about patients being shifted off of doses? I think it reflects what Your Honor was discussing with my colleague on the other side, is that it's a little unclear exactly why they were shifted off. You do point to the... I think we're... One is where patients shifted off of doses before 12 weeks and then after 12 weeks. Surely after 12 weeks the patients receiving the .5 milligram dose were shifted off or were up-dosed according to the thing to test safety. But I thought there was a suggestion that was shifting off the .5 dose before 12 weeks. Did that happen? I believe it did, but I think the record's unclear. I think the point is that... Why were they shifted off before the 12 weeks when this determination was made to conduct the safety analysis? Again, I don't think the record discloses that, but what I would say is that it doesn't matter for these claims. I'm just trying to understand what the record does show about it. Does it show that before 12 weeks people were shifted off the .5 dose? I don't think the record is clear about that. It says some were up-dosed, but it doesn't... Before 12 weeks. It says some were up-dosed and I think it's... Before 12 weeks. I think it's ambiguous on that point. I don't think it says one way or the other. It says that some were up-dosed. It says some were up-dosed, but I don't think it explicitly says that they were up-dosed along the way. I think that's clearly at a disposition, but I don't think it matters because... What about all patients that were initially getting .5? Were they all up-dosed? That's the inference from the chart in Rao that when you get to 12 weeks because it ends there that there was no one any longer on that dose. Again, I don't think that matters because if you look at the chart, it clearly shows that there's substantial success. They improved 30% from baseline. 42% of them at some point had received an ACR 20 response, and if you look at 151, the petitioner argued and the board notes that Remicade, which was the competitor drug, was only doing between 30% and 38% ACR 20 response, so it's hard to say that something that was more successful than the competitive drug that was then on the market is not adequately successful for claims that admittedly cover even something that doesn't improve a patient's health but just slows their decline. And so the fact that some patients were being up-dosed because they weren't performing well, however that's defined, and it's not clear from the record, but whatever that means, the fact that some patients were receiving benefit from the drug, which is all that's necessary to teach these, to make these claims obvious. And I think it might be helpful to look at this court's decision in Tyco where there was, in the prior art, there were higher doses disclosed in the prior art, and then there was one teaching of the claimed lower dose  Because the claims in that case weren't limited to a particular subset of patients, this court found that sufficient to disclose it as obvious. This court has generally treated these dosing patents as a routine optimization within a range because as the board found at 31 and 37, what doctors do in these circumstances is tailor particular doses to particular patients. So if if you're looking for 31 and 37, the board said that a skilled artisan designing a dosing regimen for clinical trials would have balanced efficacy with other factors including safety and patient preference. So the fact that there was If you look at RAL at 28085 where it says patients with 0.05 milligram body weight over 12 weeks resulted in a moderate DAS response in 78% of patients. Is there something wrong with that figure? Is that teaching success with 0.5 milligram per kilogram? I would say that's teaching success. What you're pointing to in Kempenny actually covers 0.5 to 10 milligrams. That's like the same 78% figure. And the 42% And on 2704 which is in Kempenny in table 2, it reports weekly 0.5 0.5 milligram is receiving an ACR 20 response, 70% of them, right? Yes, Your Honor. The weekly 0.5 subcutaneous injections So that's the maximum ACR response. ACR 20 response. There's also how they were doing over the course of time which I think might account for the difference there. So if at some point you had 70% getting an ACR 20 response but then that later declined and I think that might account for Raoul's disclosure of 42% at any given time. I thought the chart 4 and 5 in Raoul 28087 and 28088 show that at 12 weeks the 0.5 is about the same as the other dosages, right? No, I think that's right. Very clearly the trend lines for the 0.5 milligram dose is not substantially different than the other ones which is why I don't think it's appropriate to attribute the updosing whenever it occurred to an overall lack of efficacy. Just to understand those graphs a little better is it possible that what's going on in the latter half of that 12 week cycle with the 0.5 milligrams is that those data points are now including people that have been moved from placebo to the 0.5 milligram dosage? That may be I don't think I'd consider that a possibility but that could be Were they also moving people from the placebo to the higher doses? Yes. So there were people in the placebo group that were that there were the 1 milligram per kilogram placebo group that would have been put on to that at that point as well. You mean there were people going from placebo straight to 1 milligram? People going straight from placebo to 3 milligram? Yes. There were people that were receiving 3 milligrams of placebo and then those people were brought into their ordinary cohort at the point where they took the patients off the placebo. And so if you were on the 3 milligram per kilogram placebo then you would have been brought into the then you would have been brought into the 3 milligram per kilogram dose range once they entered the placebo portion of the study. What about the lower bioavailability concern with adjusting from intravenous to subcutaneous administration? It appears that the board was relying on the idea that 0.5 milligram per kilogram is the equivalent of a fixed dosage of 40 milligrams. You could just take that and go to a subcutaneous biweekly administration and then we would arrive at the claims. I think that's right, Your Honor. Before the board... But then the counter argument to that is you're going to get a lower bioavailability by administering subcutaneously so you're not going to get the same effect as you would by administering intravenously. So that's... As a general proposition, that's right. But in 28081 at the very end of Campany, Campany says that that's not the case for Humira here. And as for the convertibility of fixed and weight-based doses, the patent owner conceded before the board the equivalent of 0.5 milligram per kilogram and a 40 milligram dose because the average patient is about 80 kilograms. They're going to be able to take care of approximately the same. Anything further? The end of the bottom of the first column of the last page of Campany 28081. The interview isn't... The patient is receiving the drug subcutaneously and the interview is rejected respectively. Oh, I'm sorry. The bottom of the run-up of the paragraph, investigators concluded that D2E7 subcutaneously was safe and as effective when administered intravenously. Unless the board has further questions. Thank you. Mr. Saunders, you have two minutes. Picking up on that last point, at 6134, one of the therapist experts asked about this intravenous comparison. It's a study that has no intravenous. Question, there's no intravenous arm in that study, correct? Answer, as far as I know, there's not. Question, what does the intravenous administration state refer to in that statement? Answer, I don't know. But what we do see is on the base of RAU2000, one of the main references here, the express statement at 28081 in the appendix, the quote, intravenous administration gives advantages. Statement that the board never  Segmenting back to up-closing for a minute. The statement about 78% that's being, that you're talking about on the first page of RAU, that's a statement about the DE04 study is the weekly study, not the, at least every other week study that's being relied on for obviousness. And on up-dosing, I think if one thing has come clear from this argument today, it's the sheer amount of uncertainty from the faces of these references. Our experts talked about up-dosing and their interpretation of it at 31387 of the appendix. The question was put to the EI's expert, where does it tell us in those figures how many patients were being dosed at 0.5 mg per kg? The answer, it doesn't tell you how many patients were there. It tells you that those were all the patients that were there at that dose level. And it goes on to say there were somewhere offered higher doses. Yes, that was obvious. But if the up-dosing is going to be dismissed on the ground that this was just converting people for reasons of safety or on the ground, contrary to the record, that it didn't happen after 12 weeks, where are the word's findings? It didn't make those findings. It left that uncertainty hanging and counted against us as a factor. Okay, thank you Mr. Senator. I think both counsel, the case is submitted.